## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

**EDWARD A. BATTS,**
**ADC # 91375**                                                          **PLAINTIFF**

**V.**                              **No. 2:08CV00149 JMM-BD**

**LARRY NORRIS,** *et al.*                                              **DEFENDANTS**

### RECOMMENDED DISPOSITION

**I.**    **Procedure for Filing Objections:**

The following recommended disposition has been sent to United States District

Judge James M. Moody.  Any party may file written objections to this recommendation.

Objections should be specific and should include the factual or legal basis for the

objection.  If the objection is to a factual finding, specifically identify that finding and the

evidence that supports your objection.  An original and one copy of your objections must

be received in the office of the United States District Court Clerk no later than fourteen

(14) days from the date of this recommendation.  A copy will be furnished to the

opposing party.   Failure to file timely objections may result in waiver of the right to

appeal questions of fact.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

II.    **Procedural History**:

Plaintiff, previously an Arkansas Department of Correction ("ADC") inmate,

originally filed this action pro se under 42 U.S.C. § 1983.  (Docket entry #2)  In his

Complaint, Plaintiff claimed that while he was housed at the East Arkansas Regional Unit

("EARU") of the ADC, Defendant Charlotte Green, an employee of Correctional Medical

Services ("CMS"), violated CMS policy and disclosed to the general inmate population at

the EARU the fact that Plaintiff is blind in his left eye.  In addition, Plaintiff alleged that

in January 2008, he was seen by a nurse for problems with his left eye and was referred to

the unit provider for further treatment.  Plaintiff claimed that he had not been seen by the

unit provider.  Plaintiff named as Defendants Charlotte Green, Larry Norris, Greg

Harmon, and John Doe nurses and regional unit staff in his original Complaint.

Upon a review of the original Complaint, the Court ordered Plaintiff to file an

Amended Complaint specifically identifying those individuals who had acted

unconstitutionally and describing any injury that he suffered as a result of the conduct.

(#5)  Plaintiff filed an Amended Complaint, as ordered.  (#8)

After screening Plaintiff's Amended Complaint, the Court recommended that

Defendants Norris, Harmon, and Austin be dismissed from this action without prejudice,

and that Plaintiff's claims against Defendants Green and Kelley in their official capacities

be dismissed without prejudice. (#9)  The District Court adopted this Court's

recommendation.  (#14)

2

Plaintiff then filed a motion to amend his Complaint.  (#22)  The Court granted Plaintiff's motion and instructed the Clerk of the Court to file Plaintiff's motion to amend as his Second Amended Complaint.  (#28)

The Court recommended that Plaintiff's claim regarding the disclosure of his confidential medical information be dismissed.  (#35)  In addition, the Court recommended that Plaintiff's claims for failure to protect, retaliation, and equal protection be dismissed.  Further, the Court recommended that Mr. Harmon, Ms. Austin, and Mr. Norris be added as party Defendants.  (#35)  On December 1, 2008, the District Court adopted this Court's recommendation.  (#54)

On February 20, 2009, David Graham, Jr. entered his appearance as attorney for Plaintiff.  (#71)  On August 28, 2010, Plaintiff filed his Third Amended Complaint.  (#90)

Now pending is a motion for summary judgment filed by Defendants Larry Norris, Greg Harmon, and Wendy Kelley ("ADC Defendants") and a motion for summary judgment filed by Charlotte Green, Marie Austin, and Correctional Medical Services ("CMS Defendants").  (#103 and #106)  Plaintiff has responded to both motions.  (#113, #114, and #115)  The Court recommends that both motions for summary judgment (#103 and #106) be GRANTED and that Plaintiff's claims be dismissed with prejudice.

III.   **Factual Background:**

On December 18, 2007, Plaintiff was admitted to the ADC.  (#113 at p.5)  During his initial physical examination, Plaintiff stated that he was legally blind in his left eye

3

due to a baseball-bat injury and that his left eye had been operated on three or four times, the last surgery being in 2004 while Plaintiff was incarcerated at the ADC on a previous conviction.[1]  (#107-10 at p.12)  The examining nurse also noted that Plaintiff had a prescription for artificial tears to be applied four times daily.[2]  (#107-10 at p.12)

Upon intake, Plaintiff was housed at the Diagnostic Unit in Pine Bluff, Arkansas. (#113 at p.5)  On December 28, 2007, Plaintiff was transferred to the EARU.  (#113 at p.5)

On December 29, 2007, Plaintiff filed a sick-call request "due to [his] left eye injury."  (#107-10 at p.27)  In the request, Plaintiff explained that he had previously undergone four surgeries on his globe and retina, and was "hurting very badly."  (#107-10 at p.27)  Plaintiff's sick-call request was identified as "urgent."  (#107-10 at p.27)

On December 31, 2007, Plaintiff filed an informal resolution in which he complained of serious pain in his left eye.  (#107-10 at p.28)  Plaintiff was seen by Nurse Gray (not a party to this lawsuit) on that date and was scheduled to see a mid-level provider on January 4, 2008.  (#107-10 at p. 28-29)  Plaintiff's appointment with the mid-

---

[1]  The record is unclear as to whether Plaintiff actually had three, four, or five prior eye surgeries.  (#107-10 at p.12)

[2]  In his Third Amended Complaint, Plaintiff alleges that "[p]rior to December 31, 2007, [Plaintiff's] medical records on file with the ADC reflected his glaucoma."  (#90 at p.4)  Plaintiff, however, has not provided the Court any such records.  The medical records provided for Plaintiff's initial physical examination do not include any reference to glaucoma.

level provider, however, was re-scheduled to January 16, 2008, due to a conflict with Plaintiff's dental appointment scheduled for that same date.  (#114-3 at p.9-10)

On January 9, 2008, Plaintiff was seen in sick call by LPN Key (not a party to this lawsuit).  (#107-10 at p.32)  Nurse Key noted that Plaintiff complained of severe pressure in his eye causing him so much pain that he was spitting up blood.  (#107-10 at p.32)

On January 16, 2008, Plaintiff was supposed to be seen by a mid-level provider. The appointment, however, again had to be rescheduled due to another conflict with Plaintiff's dental appointment on the same date.  (#114-3 at p.9-10)  Plaintiff's eye appointment was re-scheduled for February 15, 2008, six weeks after he first complained of eye pain.  (#114-3 at p.14)

On January 21, 2008, Plaintiff submitted another sick-call request, again complaining about pain in his eye.  (#107-10 at p.35)  Plaintiff also explained that he had not seen a doctor although he had been complaining about this pain for nearly three weeks and that his grievance had not been answered.  (#107-10 at p.35)  This sick call was designated as routine.  (#107-10 at p.35)

On January 29, 2008, eight days later, Plaintiff was seen in sick call by LPN Sherman (not a party to this lawsuit).  (#107-10 at p.36)  At that time, Plaintiff complained about the pressure in his left eye.  (#107-10 at p.36)  LPN Sherman prescribed ibuprofen for pain and referred Plaintiff to the mid-level provider.  (#107-10 at p.36)

On February 15, 2008, Plaintiff saw Ella Taylor, the EARU's mid-level provider, who referred him to the Simmons Eye Clinic, a free-world optometry clinic. (#107-10 at p.37)  Although Ms. Taylor notes that the consult was completed on that date, the actual consult request is dated March 21, 2008.[3]  (#107-10 at p.39)  Notably, the request notes that the presumed diagnosis is "retina detachment left eye." (#107-10 at p.39)  The request makes no mention of glaucoma.

On April 11, 2008, Plaintiff was seen by Dr. Simmons at Simmons Eye Clinic. (#107-10 at p.40)  According to Dr. Simmons's declaration, Plaintiff's intraocular pressure ("IOP") in his right eye was eleven, and the IOP in his left eye was twenty.[4] (#107-5 at p.1)  Plaintiff refused to allow Dr. Simmons to dilate his eyes. (#107-5 at p.1) Dr. Simmons concluded that Plaintiff's left eye pressure and pain were induced by trauma, not glaucoma. (#107-5 at p.1)  Dr. Simmons prescribed eye glasses and Timoptic eye drops to treat Plaintiff's eye pressure. (#107-5 at p.1)  Dr. Simmons specifically noted that he was recommending the eye drops for comfort but "[c]linically, there was not a need for glaucoma drops." (#107-5 at p.1)  Dr. Simmons recommended that Plaintiff be examined again in four months. (#107-5 at p.2)

---

[3]  There appears to be a dispute as to whether the March 21, 2008 referral was actually a "redo" of a previous referral that might have been lost. (#114-4 at p.16-17)

[4]  In his deposition, Dr. Anderson defined intraocular pressure as "the pressure within the eyeball." (#107-4 at p.2)  Dr. Simmons also explains in his affidavit that a reading of twenty or below is normal. (#107-5 at p.1)

On April 17, 2008, Dr. Roland Anderson reviewed Dr. Simmons's consultation report.  (#107-10 at p.43)  At that time, eyeglasses and an eye-drop prescription were ordered for Plaintiff.  (#107-10 at p.41-43)  In addition, Dr. Anderson recommended that a follow- up consult be generated to continue to monitor Plaintiff's IOP.  (#107-10 at p.43)  On the same day, Defendant Green prepared a consultation request for an IOP/optometry follow-up examination.  (#107-10 at p.41-43)

On May 2, 2008, Plaintiff was transferred to the Randal L. Williams Correctional Facility ("RLWCF").  (#115 at p.15)  Upon transfer, Plaintiff's medications were noted as Timolol and artificial tears.  (#107-10 at p.46 and 48)

On May 15, 2008, Plaintiff submitted a sick call request stating that he has "had four surgeries in [his] left eye" and that it was "hurting very badly."  (#107-10 at p.50)  Plaintiff also complained that he had not received his prescription eye glasses.  (#107-10 at p.50)  Plaintiff received his eye glasses that same day.  (#107-10 at p.50)  On May 19, 2008, Plaintiff signed a "Release from Responsibility for Non-Treatment" form when he refused his request for sick call on May 15th because he had received his eye glasses and no longer needed to be seen.  (#107-10 at p.52)

On June 5, 2008, Plaintiff was seen as a walk-in patient at the infirmary at the RLWCF by LPN Handly (not a party to this lawsuit).  (#107-10 at p.53)  Plaintiff complained of eye pain and blurred vision.  (#107-10 at p.53)  On June 14, 2008, Plaintiff received his Timolol and artificial tears. (#107-10 at p.55)

7

On June 24, 2008, Plaintiff was seen in sick call by Dr. Antosh.  (#107-10 at p.56)

Plaintiff complained that his eye drops were no longer working.  (#107-10 at p.56)  Dr.

Antosh's findings included "no visible sclera injection, pressure grossly equal but tender

over left orbit."  (#107-10 at p.56)  Her assessment was "history of left eye injury –

known glaucoma."  (#107-10 at p.56)  She referred Plaintiff to the Jones Eye Institute.

(#107-10 at p.56)

On July 29, 2008, Dr. Antosh signed a consultation request form so that Plaintiff

could be "recheck[ed] for glaucoma" at the Jones Eye Institute.  (#107-10 at p.57)  The

reviewing individual noted that the consult request was a "duplicate" and referred to the

"request dated 4/08 from EARU."  (#107-10 at p.57)  Apparently, at that time, Plaintiff

was referred to the Simmons Eye Clinic based upon the previous request.

On September 11, 2008, Dr. Simmons examined Plaintiff and noted that Plaintiff

complained of pain and a loss of vision in his left eye.  (#107-5 at p.2)  His IOP was 12 in

his right eye and 21 in his left.  (#107-5 at p.2)  Dr. Simmons explained that "a pressure

of 21 does not cause pain.  Usually, a patient does not feel pain from pressure until it is in

the 40s."  (#107-5 at p.2)  Again, Plaintiff refused to allow Dr. Simmons to dilate his

eyes.  (#107-5 at p.2)  Dr. Simmons recommended that Plaintiff take Zalatan for the pain

in his left eye and he prescribed 800 mg of ibuprofen to be taken every four to six hours

for pain.  (#107-5 at p.2)  Dr. Simmons recommended that Plaintiff be referred to the

Jones Eye Institute for pain management.[5]  (#107-5 at p.2)

On November 4, 2008, Plaintiff was transferred to the Pine Bluff Unit of the ADC.

(#107-10 at p.63)  On November 6, 2008, Plaintiff filed a sick-call request stating that he

was experiencing a build up of pressure in his left eye and that he was in severe pain.

(#107-10 at p.66)

On November 19, 2008, Plaintiff was examined at the Jones Eye Institute for a

"glaucoma recheck."  (#107-10 at p.71)  Plaintiff's IOP was 12 in his right eye and 22 in

his left eye.  (#107-10 at p.71)  His left iris was noted to be irregular.  (#107-10 at p.72)

A history of glaucoma in his left eye was noted.  (#107-10 at p.71)  Dr. Casciano

prescribed two types of eye drops for Plaintiff and recommended a follow-up examination

in four to six months.  (#107-10- at p.73)  His diagnosis was "elevated intraocular

pressure in left eye."  (#107-10 at p.73)

On November 24, 2008, Dr. Antosh submitted two "non-formulary medication

request" forms asking that each of the prescriptions suggested by the ophthalmologist  at

the Jones Eye Institutes be filled for Plaintiff.  (#107-10 at p.77-79)  Dr. Antosh noted

that the reason for the prescription request was glaucoma.[6]  (#107-10 at p.77-78)  Dr.

Antosh recommended that Plaintiff be rechecked at the Jones Eye Institute in one month.

---

[5] In his affidavit, Dr. Simmons stated that the only way to ease Plaintiff's pain
would be to remove the eye completely.  (#107-5 at p.2)

[6] In his request, Dr. Antosh noted, "Rx=Glaucoma."  (#107-10 at p.77-78)

(#107-10 at p.79)  In December 2008, Plaintiff was released from ADC custody.  (#90 at

p.6)

## IV.   **Discussion**:

A.     Standard

Summary judgment is appropriate when the evidence, viewed in the light most

favorable to the nonmoving party, presents no genuine issue of material fact.  FED. R.

CIV. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 246 (1986).  Once the moving party has successfully carried its

burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the

pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing

that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); *Mosley v. City of*

*Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) ("The nonmoving party may not 'rest

on mere allegations or denials, but must demonstrate on the record the existence of

specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le*

*Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).  If the opposing party fails to carry that burden

or fails to establish the existence of an essential element of its case on which that party

will bear the burden of proof at trial, summary judgment should be granted.  See *Celotex,*

477 U.S. at 322.

B.      ADC Defendants

In their motion for summary judgment, the ADC Defendants argue that Plaintiff's claims against them fail as a matter of law because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); Plaintiff failed to establish a prima facie case of deliberate indifference; and they are entitled to both sovereign and qualified immunity.  The Court agrees that Plaintiff failed to exhaust his administrative remedies against the ADC Defendants and that he has failed to provide sufficient proof to support his deliberate indifference claim against them.  Accordingly, the ADC Defendants are entitled to judgment as a matter of law.

1.      Exhaustion

The PLRA requires that prisoners exhaust all "available" remedies before filing suit under 42 U.S.C. § 1983.  See 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819 (2001) (holding that available remedies "must be exhausted before a complaint under § 1983 may be entertained").  The United States Court of Appeals for the Eighth Circuit has defined "available" as "capable of use for the accomplishment of a purpose; immediately utilizable [and] accessible."  *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001).  It does not matter whether the prisoner subjectively believed that there was no point in pursuing his administrative remedies.  *Lyon v. Vande Krol*, 305 F.3d 806, 808-09 (8th Cir. 2002); *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000), *cert. denied* 531 U.S. 1156 (2001).

11

If exhaustion is not complete by the time of the filing of the prisoner's complaint, dismissal is mandatory. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). Prisoners have been excused from completing administrative procedures only when correctional officials have prevented prisoners from utilizing the procedures or when the officials themselves have failed to comply with the administrative procedures. *Miller v. Norris*, *supra* at 740; *Foulk v. Charrier*, 262 F.3d 687, 697-98 (8th Cir. 2001).

Here, the ADC Defendants argue that Plaintiff failed to exhaust his administrative remedies with regard to his claims against each of them. In support of their motion, the ADC Defendants attach the affidavit of Tiffanye Compton and the declaration of Charlotte Gardner. (#105-2 and #105-5) In Ms. Compton's affidavit, she testifies that, after reviewing Plaintiff's file, she "found no documentation of any grievance appeals regarding complaints about Larry Norris, Wendy Kelley, and Greg Harmon during any time frame." (#105-2 at p.1) In Ms. Gardner's affidavit, she testified that "[a]s of December 4, 2008, none of the grievances filed by [Plaintiff], which were appealed to the final level of the appeal process, complain about Wendy Kelley's conduct. [Plaintiff] has not fully exhausted his administrative remedies with respect to complaints about Ms. Kelley." (#105-5 at p.1)

In his response to the ADC Defendants' motion, Plaintiff does not argue that he actually fully exhausted his claims against the ADC Defendants. Plaintiff simply states that the ADC Defendants "make no mention of the fact that [Plaintiff] was moved three

times while grievances were pending and then was finally paroled before he could have exhausted his internal, prison remedies." (#114 at p.18)  While Plaintiff seems to argue that he was prevented from fully appealing grievances while housed at the ADC, he fails to come forward with any evidence that he actually filed <u>any</u> grievances against any of the ADC Defendants.  Moreover, although Plaintiff mentions that he was moved several times while in the custody of the ADC, it is clear that he was not prevented from filing and fully exhausting all grievances while housed at the ADC, as evidenced by the fully exhausted grievances that the ADC Defendants attach to their motion for summary judgment. (#105-9, #105-10, #105-11, #105-12)  As a result, Plaintiff has failed to come forward with any evidence that he was prohibited from fully exhausting his administrative remedies against the ADC Defendants.  Therefore, he has failed to create a genuine dispute of material fact regarding exhaustion and the ADC Defendants are entitled to judgment as a matter of law.

    2.      Deliberate Indifference

In addition, in their motion, the ADC Defendants argue that even if Plaintiff had fully exhausted his administrative remedies against them, his claims against them still fail as a matter of law.

The ADC Defendants correctly observe that a medical indifference claim must be brought against the individuals directly responsible for the inmate's medical care. *Keeper v. King*, 130 F.3d 1309 (8th Cir. 1997).  Further, in order to succeed on a medical

13

indifference claim, "'[t]he [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

Here, the undisputed evidence shows that the ADC Defendants are not medical personnel and do not provide medical treatment to inmates.  (#113 at p.2-5)  Further, Plaintiff specifically admits that Defendant Norris was never made personally aware of Plaintiff's medical condition.  (#113 at p.2)  Plaintiff also admits that Defendant Harmon was not aware of any grievances filed by Plaintiff relating to medical issues and that Defendant Harmon was not informed of any delay in Plaintiff's medical care.  (#113 at p.4)

Although it appears that Defendant Kelley was aware of Plaintiff's medical condition through the grievance process, in her deposition, Defendant Kelley testified that she was not responsible for scheduling Plaintiff's medical appointments and was not made aware of any scheduling delay.  (#114-3 at p.11)  Therefore, although Defendant Kelley was aware of Plaintiff's condition and found that at least one of Plaintiff's grievances had merit, when investigated, she determined that the issues of which Plaintiff complained were being resolved.  (#105-9 at p.5)  Plaintiff has failed to offer any evidence that he notified Defendant Kelley that these issues had not been resolved after

14

she responded to his grievance in March 2008.[7]  Accordingly, Plaintiff has failed to create

any dispute of material fact with regard to the ADC Defendants' conduct, and they are

entitled to judgment as a matter of law.

     C.     CMS Defendants' Motion for Summary Judgment

     In their motion for summary judgment, the CMS Defendants also argue that

Plaintiff failed to exhaust his administrative remedies against them.  In addition, the CMS

Defendants argue that Plaintiff has failed to present any evidence that the CMS

Defendants acted with deliberate indifference to his medical needs or that CMS had an

unconstitutional policy or custom that caused Plaintiff to suffer any injury.

     After reviewing the evidence, the Court concludes that Plaintiff failed to exhaust

his administrative remedies against Defendant Austin, and that Plaintiff has failed to

establish that the CMS Defendants acted with deliberate indifference to his medical

needs.  Further, Plaintiff has failed to prove that CMS had an unconstitutional policy or

custom.  Accordingly, the CMS Defendants are entitled to judgment as a matter of law.

---

    [7]  The Court notes that Defendant Kelley also responded to Plaintiff's grievance
EA-08-00075.  In her response, Defendant Kelley found that although Plaintiff's referral
to a mid-unit provider was not "timely completed," it was scheduled to take place that
week and that Plaintiff's appeal was "without merit."  (#105-11 at p.5)  Plaintiff has
failed to provide any evidence that Defendant Kelley was made aware of any other delay
in medical treatment.

1.      Exhaustion

Like the ADC Defendants, the CMS Defendants contend that Plaintiff failed to exhaust his administrative remedies against them as required by the PLRA.  Based upon the evidence presented, it appears that Plaintiff fully exhausted four grievances while housed at the EARU:  EA-08-00016, EA-08-00074, EA-08-00075, and EA-08-00076. (#115 at p.3)  Plaintiff admits that the CMS Defendants are not identified in any of those grievances.  (#115 at p.4)  In grievance EA-08-00075, however, Plaintiff specifically complains that he has been denied medical treatment by the "East Arkansas Regional Unit medical staff."  (#107-2 at p.5)  Viewing the evidence in a light most favorable to the Plaintiff, he adequately grieved the lack of medical treatment as to Defendants CMS and Green.  Based upon the evidence presented, however, Plaintiff did not exhaust his administrative remedies against Defendant Austin.

Defendant Austin was employed as the health services administrator at the Randal L. Williams Correctional Facility ("RLWCF") during the time relevant to this lawsuit. (#115 at p.2)  It is undisputed that the four fully exhausted grievances originated from the EARU.  Although Plaintiff claims that he was transferred, then paroled before he could have fully exhausted his grievances, he has failed to offer any evidence that he ever submitted any grievance against Defendant Austin or that he submitted any grievances at

all while housed at the RLWCF.  Accordingly, Plaintiff has failed to create a dispute of

material facts on this issue, and his claims against Defendant Austin should be dismissed.[8]

2.      Deliberate Indifference

 "Whether a prison's medical staff deliberately disregarded the needs of an inmate

is a factually-intensive inquiry."  *Meuir v. Greene County Jail Employees*, 487 F.3d 1115,

1118 (8th Cir. 2007).  "The plaintiff-inmate must clear a substantial evidentiary threshold

to show that the prison's medical staff deliberately disregarded the inmate's needs by

administering an inadequate treatment."  *Id*.

> Negligent misdiagnosis does not create a cognizable claim under § 1983.
>
> [A] complaint that a physician has been negligent in diagnosing or treating a
> medical condition does not state a valid claim of medical mistreatment under the
> Eighth Amendment.  Medical malpractice does not become a constitutional
> violation merely because the victim is a prisoner.  In order to state a cognizable
> claim, a prisoner must allege acts or omissions sufficiently harmful to evidence
> deliberate indifference to serious medical needs.

*Estelle,* 429 U.S. at 106, 97 S.Ct. 285.  See also *Popoalii v. Corr. Med. Servs*., 512 F.3d

488, 499 (8th Cir.2008) ("Medical malpractice alone . . . is not actionable under the

Eighth Amendment.").  "Deliberate indifference entails a level of culpability equal to the

criminal law definition of recklessness, that is, a prison official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm

---

[8] The Court notes that because it finds that Plaintiff has failed to establish his
claim that the CMS Defendants acted with deliberate indifference to his medical needs,
Plaintiff's claims against Defendant Austin should be dismissed with prejudice.

exists, and he must also draw the inference." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (internal quotation omitted).

Here, based upon the undisputed evidence, when Plaintiff entered the ADC in December 2007, he was legally blind in his left eye.  Plaintiff explained to the examining nurse at his initial physical examination that he previously had been injured with a baseball bat and had undergone at least four surgeries on his left eye.  Plaintiff did not mention that he suffered from glaucoma.

Days after Plaintiff arrived at the EARU, he began complaining of pain in his left eye.  It is undisputed that Plaintiff had to wait almost six weeks before being examined by a mid-level provider.  Defendants acknowledge that such a delay should not have occurred.  (#114-3 at p.10, #115-10 at p.1)  Defendants also acknowledge that after the mid-level provider recommended that Plaintiff be seem by an optometrist, the referral should have been processed immediately and Plaintiff should have been seen within thirty days.  (#114-3 at p.17 and 21, #114-4 at p.15, and #115-3 at p.1)  In fact, Plaintiff had to wait almost two months before seeing an optometrist.

When Plaintiff was examined by Dr. Simmons in April 2008, however, his IOP was normal in both eyes.  Further, Dr. Simmons testified that the pain Plaintiff was experiencing was due to trauma, not glaucoma.[9]  Dr. Simmons prescribed Plaintiff eye

---

[9]  The Court notes that Plaintiff produced the affidavit of optometrist, Elvin Fenton, in support of his Response to the Defendants' motions for summary judgment. (#115-6)  Dr. Fenton states after reviewing Plaintiff's medical records, he concluded that

drops to treat eye pressure, but specifically noted that the eye drops were not clinically necessary.

Shortly after Plaintiff was transferred to the RLWCF in May 2008, he submitted a sick call request complaining of pain in his left eye. Once he received his prescription eye glasses, however, he signed a "Release from Responsibility for Non-Treatment" because he no longer needed to be examined.

In June 2008, Plaintiff was examined both as a walk-in at the infirmary and during sick call, complaining of left eye pain on both occasions. Dr. Antosh noted that Plaintiff's eye "pressure [was] grossly equal," but indicated that Plaintiff had a history of both injury to his left eye and glaucoma. He referred Plaintiff to the Jones Eye Institute.

Although Dr. Antosh's consultation request was not granted, Plaintiff was again examined by Dr. Simmons in September of 2008. At that time, Plaintiff's IOP was twelve in his right eye and twenty-one in his left. (#107-5 at p.2) Dr. Simmons explained that "a pressure of 21 does not cause pain." Plaintiff was prescribed pain medication and

---

Plaintiff might have suffered from Angle Recession Glaucoma, which could have been the source of Plaintiff's pain. (#115-6 at p.1) (emphasis added) Dr. Fenton refers to an examination or assessment of Plaintiff completed in April 2009. (#115-6 at p.1) The Court does not have access to those records and finds this testimony inconclusive. Although Dr. Fenton states that "[i]t does appear that there was a loss of vision from 20/200 to blind in the left eye from the date of the consult request 3-21-08 to the first doctor appointment on 4-15-08," as previously noted, Plaintiff was legally blind in his left eye when he entered the ADC in December 2007. (#115-6 at p.2) Accordingly, Dr. Fenton's testimony does not create any dispute of material fact.

Dr. Simmons recommended that Plaintiff be referred to the Jones Eye Institute for pain management.

On November 19, 2008, Plaintiff was examined at the Jones Eye Institute. Plaintiff's IOP was twelve in his right eye and twenty-two in his left. His left iris was noted to be irregular and pale. A history of glaucoma in his left eye was noted. Two different kinds of eye drops were prescribed to Plaintiff. A follow-up examination was recommended in four to six months. His diagnosis was "elevated intraocular pressure in left eye." (#107-10 at p.77-78)

Based upon these facts, the Court cannot conclude that Defendants acted with deliberate indifference to Plaintiff's medical needs. While Plaintiff experienced several delays in treatment, such procedural delays amount, at most, to negligent conduct, not deliberate indifference. Further, Plaintiff has failed to offer any evidence that he sustained any actual injury as a result of these delays. Although Plaintiff claims that his eye sight in his left eye worsened between April 2008 and June 2008, he admits that he was legally blind upon entering the ADC. Further, Plaintiff was taking the glaucoma eye drops that Dr. Simmons had recommended during that time. Although Dr. Antosh recommended that Plaintiff be examined by the Jones Eye Institute at the end of June 2008, and Plaintiff was not treated at the Eye Institute until November 2008, Plaintiff was evaluated by Dr. Simmons during that time and was continually administered eye drops.

The Court acknowledges that Dr. Simmons explained in his affidavit that when he examined Plaintiff in April 2008, Plaintiff could detect hand motion in his left eye. (#107-10 at p.1)  When Dr. Simmons examined Plaintiff in September 2008, he could detect only light perception.  (#107-10 at p.2)  Plaintiff, however, has failed to offer any evidence that such a change was the direct result of any delay in medical treatment. Again, Plaintiff was continually taking prescription eye drops during that time period and Dr. Simmons did not recommend that Plaintiff be examined for another six months.

Dr. Fenton testified in his affidavit that "Dr. Simmons and subsequent Eye Care Professionals did exactly what they should have done, having patient come back for follow-up care etc."  (#114-1 at p.2-3)  Here, any change in Plaintiff's vision apparently occurred after he was initially seen by Dr. Simmons.  In addition, Plaintiff refused medical treatment in May 2008 and was examined by Dr. Antosh in June 2008.  Although Dr. Antosh's referral to the Jones Eye Institute was delayed, when Plaintiff was eventually examined, he had an IOP of twenty-two in his left eye.  Additional eye drops were recommended for Plaintiff and a follow-up examination was to be scheduled in four to six months.  Thus, the treatment plan for Plaintiff was almost identical to the treatment plan that had been in place since June 2008.  Based on this evidence, the Court cannot conclude that Defendants acted with deliberate indifference to his medical needs.

3.     Unconstitutional Policy or Custom

In a § 1983 action, a corporation acting under color of state law may be held liable only for unconstitutional policies or practices.  It may not be held liable for the individual actions of its employees under a theory of respondeat superior.  See *Burke v. North Dakota Dept. of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002).  Therefore, CMS can be held liable in this action only if "there was a policy, custom, or official action that inflicted an actionable injury."  *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). See also *Clay v. Morgan*, 79 Fed. Appx. 940, 941 (8th Cir. 2003) (unpub. per curiam) (citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-976 (8th Cir. 1993)) ("A corporation like CMS can be liable only if it acts under color of state law, and its policies, customs, or actions by those who present policy inflict injury actionable under section 1983").  Here, Plaintiff has failed to provide any evidence of such a policy or custom. Although there were apparent delays in Plaintiff's medical treatment, the delays were isolated incidents and were not the result of any policy or custom of CMS.  Because Plaintiff has not come forward with any evidence of a policy or custom that resulted in injury, he has failed to create any genuine question of material fact with regard to this issue, and CMS is entitled to judgment as a matter of law.

**V.**     **Conclusion**:

The Court recommends that the motions for summary judgment (#103 and #106) be GRANTED.  Plaintiff claims should be DISMISSED with prejudice.

22

DATED this 7th day of June, 2010.

_____
UNITED STATES MAGISTRATE JUDGE